UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>NORTH PROVIDENCE PRIMARY CARE ASSOCIATES INC., NORTH PROVIDENCE URGENT CARE, INC., Dr. ANTHONY FARINA, JR., AND BRENDA DELSIGNORE,<br><br>Defendants. | Civil Action No.  1:22-cv-102<br><br>Injunctive Relief Sought<br><br>Jury Demand |

# **COMPLAINT**

This is a case about a doctor and other Defendants who have and are retaliating against a former receptionist for asserting her statutory rights under the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (the "OSH Act") to raise safety and health complaints with her employer. Defendants North Providence Primary Care Associates Inc., North Providence Urgent Care, Inc., Dr. Anthony Farina, Jr., and Brenda Delsignore (collectively, the "Defendants") fired Victoria Sherman because she complained to management that a COVID-19 positive coworker was at work and potentially exposing Sherman and others to the virus. After they fired Sherman, Defendants continued to retaliate against her by failing to provide Sherman with the paperwork that she needed to obtain benefits to support herself and her family and by facilitating anonymous phone calls to harass Sherman. Defendants' retaliation against Sherman may well dissuade employees from exercising their statutory rights and participating in an ongoing lawsuit and separate investigation brought by the Secretary to ensure that employees are protected from COVID-19.

1

Defendants' termination of Sherman, and subsequent retaliatory conduct, is unlawful retaliation under Section 11(c) of the OSH Act, 29 U.S.C. § 660(c). The conduct is especially egregious because when Defendants retaliated against Sherman they knew that Sherman was at a high risk of serious illness if she contracted COVID-19 and that their retaliatory actions were prohibited by the OSH Act. The Secretary primarily seeks a judgement and order from the Court: (1) enjoining and restraining Defendants from violating Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1); (2) awarding lost wages, interest, and compensatory damages to Sherman; (3) awarding punitive damages for Defendants' unlawful retaliation against Sherman; and (4) requiring Defendants to inform employees of their rights under Section 11(c) of the OSH Act, 29 U.S.C. § 660(c).

## **THE OSH ACT, JURISDICTION, AND VENUE**

1.  The Secretary brings this case pursuant to Section 11(c) of the OSH Act, 29 U.S.C. § 660(c). Among other things, Section 11(c)(1) of the OSH Act prohibits the discharge of or discrimination against "any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter." 29 U.S.C. § 660(c)(1); *accord* 29 C.F.R. § 1977.9(c) (good faith complaints to employers about occupational safety and health matters are "related to" the Act).

2.  This court has jurisdiction pursuant to Section 11(c)(2) of the OSH Act, 29 U.S.C. § 660(c)(2), and 28 U.S.C. §§ 1331 and 1345.

3.  Venue is proper in in the United States District Court for the District of Rhode Island pursuant to 28 U.S.C. § 1391(b) because (1) all the Defendants reside in this judicial

district, and (2) a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

### The Parties

#### Plaintiff, Secretary of Labor

4. Plaintiff Martin J. Walsh, Secretary of Labor, Department of Labor (the "Secretary") is vested with the authority to file suit to restrain violations of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1), and is the proper plaintiff for this action.

#### Defendant North Providence Primary Care Associates, Inc.

5. Defendant North Providence Primary Care Associates, Inc. ("NPPC") is a Rhode Island corporation with a principal office and place of business located at 180 Mineral Spring Avenue, North Providence, Rhode Island 02904 (the "North Providence Worksite"). NPPC is in the business of providing medical services.

6. Defendant NPPC owns and operates a primary care practice at the North Providence Worksite ("North Providence Primary Care").

7. At all times material to this case, Defendant NPPC was a person as defined by 29 U.S.C. § 652(4).

#### Defendant North Providence Urgent Care, Inc.

8. Defendant North Providence Urgent Care, Inc. ("NPUC") is a Rhode Island corporation with a principal office and place of business located at the North Providence Worksite. NPUC is in the business of providing medical services.

9. Defendant NPUC owns and operates an urgent care clinic at the North Providence Worksite ("North Providence Urgent Care").

10. At all times material to this case, Defendant NPUC was a person as defined by 29 U.S.C. § 652(4).

### Defendant Dr. Anthony Farina, Jr.

11. Defendant Dr. Farina is an individual who resides in Rhode Island.

12. North Providence Primary Care and North Providence Urgent Care are part of a group of medical offices operated by Dr. Farina (the "Medical Offices").

13. Dr. Farina is the medical director of the Medical Offices.

14. Dr. Farina is the sole officer and shareholder of Defendants NPPC and NPUC.

15. Dr. Farina manages the Medical Offices on a day-to-day basis in addition to working as a physician at the Medical Offices.

16. Dr. Farina exercises authority to hire, fire, and discipline employees working at the Medical Offices.

17. Dr. Farina has ultimate decision-making authority with respect to the Medical Offices and Defendants NPPC and NPUC.

18. At all relevant times, Dr. Farina was a person as defined by 29 U.S.C. § 652(4).

### Defendant Brenda Delsignore

19. Defendant Brenda Delsignore is an individual who resides in Rhode Island.

20. Delsignore is the Practice Manager for the Medical Offices.

21. Apart from Dr. Farina, Delsignore is the person with the most management authority at the Medical Offices.

22. Delsignore exercises authority to hire, fire, and discipline employees working at the Medical Offices.

23. At all relevant times, Delsignore was a person as defined by 29 U.S.C. § 652(4).

**The Secretary's pending lawsuit against the corporate Defendants to enforce OSHA citations related to COVID-19**

24. In 2021, OSHA issued two citations, one "Willful" and one "Serious", to NPPC, NPUC, and affiliated corporate entities owned by Dr. Farina (the "Employer Corporations") for violations related to COVID-19 (the "2021 Citations").

25. The first 2021 Citation is a "Willful" violation of the OSH Act's General Duty Clause, 29 U.S.C. § 654(a)(1) for exposing to and otherwise not protecting employees from COVID-19.

26. A primary allegation in the "Willful" citation is that Dr. Farina knowingly exposed his employees to COVID-19 by working at the Medical Offices and interacting with staff while he was infected and symptomatic with the virus.

27. The second 2021 Citation is for "Serious" violations of OSHA's regulations concerning the occupational use of respirators (such as N95 masks).

28. OSHA issued the 2021 Citations following an inspection by OSHA's Providence, Rhode Island Area Office in 2021 (the "2021 Inspection").

29. As part of the 2021 Inspection, OSHA Compliance Officer David Swain spoke with Dr. Farina, Delsignore, Office Manager Denise Wygant, and the Employer Corporations' inside counsel (Tim Frawley) and outside counsel (Michael Lepizzera) to inform them that the OSH Act prohibits retaliation against employees who raise safety complaints or participate in an OSHA inspection. Swain also provided an OSHA pamphlet entitled "Workers' Rights" to Delsignore, Frawley, and Lepizzera, which described the antiretaliation protections in detail.

30. On September 21, 2021, the Secretary sued the Employer Corporations to enforce the 2021 Citations (OSHRC Docket No. 21-0653) (the "OSHRC Action"). The suit is now pending before the Occupational Safety and Health Review Commission.

31. The Secretary is asking the Court to impose a $141,993 penalty for the violations alleged in the 2021 Citations.

32. The OSHRC Action is scheduled for trial on April 26 to May 4, 2022. The Secretary anticipates that management and non-management employees will be called to testify at trial.

### Complainant Victoria Sherman's work at North Providence Primary Care and Urgent Care

33. Complainant Victoria Sherman was an employee of NPPC and NPUC from approximately May 2021 to mid-January 2022.

34. Wygant was Sherman's direct supervisor during Sherman's employment.

35. Dr. Farina hired Sherman in approximately May 2021 to work as a receptionist at North Providence Primary Care.

36. As a receptionist at North Providence Primary Care, Sherman's primary duties included answering phones, checking patients in and out, and working with patient records.

37. From about November or December 2021 to January 2022, Dr. Farina assigned Sherman to conduct COVID-19 tests at North Providence Urgent Care in addition to her other duties.

38. Sherman was required to conduct COVID-19 tests even though she was not on the medical staff and was not qualified to administer COVID-19 tests or provide patient care.

39. Sherman sometimes conducted dozens of COVID-19 tests per day at North Providence Urgent Care. Many of the patients Sherman tested were positive for COVID-19.

40. Sherman did not receive the training or personal protective equipment ("PPE") that she needed to safely conduct COVID-19 tests.

41. Sherman asked Dr. Farina for safety training and a face shield, gloves, gown, and

an appropriate respirator, but he rejected or ignored the requests.

### Dr. Farina required Sherman to work in urgent care despite serious risks to Sherman's health

42. Sherman was pregnant during the time that she worked at North Providence Urgent Care.

43. As time passed, Sherman became increasingly concerned that her work testing patients at North Providence Urgent Care could expose her and her unborn baby to COVID-19.

44. The long hours, stress, and physical demands of the work at North Providence Urgent Care also affected Sherman's health. On multiple occasions, Sherman felt lightheaded or as if she was going to pass out while working at North Providence Urgent Care.

45. Sherman was concerned about her condition and scheduled an appointment with her doctor in about mid-December 2021.

46. Sherman told Dr. Farina, Delsignore, and Wygant that she needed to go to the appointment and told them her symptoms and that she was pregnant.

47. At the appointment, Sherman's doctor told her that working at the urgent care increased her risk of contracting COVID-19 and that Sherman had an increased risk of becoming seriously ill if she contracted COVID-19 while she was pregnant. The doctor advised Sherman to return to her role working exclusively at the primary care office.

48. After the appointment, Sherman explained to Dr. Farina that her doctor had told her to stop working at the urgent care because of the risks associated with contracting COVID-19 during her pregnancy.

49. Sherman asked Dr. Farina to return full time to her role as a receptionist at North Providence Primary Care.

50. Dr. Farina responded by telling Sherman that she would not have a job if she was

not willing to work at North Providence Urgent Care.

51. Sherman was supporting two young children and could not afford to lose her job.

52. Sherman continued working at North Providence Urgent Care.

**Sherman was fired after complaining about symptomatic and COVID-19 positive coworkers in the workplace**

53. From about November or December 2021 to mid-January 2022, Sherman worked with coworkers who had COVID-19 and returned to work after testing positive and/or while they still had symptoms.

54. On these occasions, Sherman was concerned that the coworkers who returned to work too early after contracting COVID-19 could expose Sherman or others to the virus.

55. Sherman complained multiple times to Defendants that they had allowed employees to return to work after a positive COVID-19 test or while they were potentially still contagious.

56. The managers dismissed Sherman's concerns.

57. On January 19, 2022, Sherman was working with a coworker at North Providence Primary Care who was coughing. The coworker had tested positive for COVID-19 the day before at one of Dr. Farina's medical offices.

58. Sherman was upset and concerned that the coworker was potentially exposing her and others to COVID-19.

59. Sherman went to Wygant, her supervisor, and told Wygant that she was concerned that the coworker had returned to work the day after a positive test and could be exposing others to COVID-19.

60. At some point during the conversation, Wygant started yelling at Sherman.

61. Wygant and Sherman went to Delsignore's office where Delsignore yelled at

Case 1:22-cv-00102-MSM-PAS   Document 1   Filed 03/11/22   Page 9 of 14 PageID #: 9

Sherman.

62. Dr. Farina was on speaker phone while Sherman, Wygant, and Delsignore were in Delsignore's office. At one point, Dr. Farina remarked that Sherman wasn't going to be employed much longer.

63. While in Delsignore's office, the managers gave Sherman a disciplinary form and told her to sign it.

64. The form stated that Sherman was being disciplined for doing something wrong with medical papers.

65. The discipline form did not mention Sherman's safety and health concerns or Sherman's interactions with management when she raised those concerns.

66. Sherman refused to sign the discipline form because it was not accurate and had nothing to do with the events of that day.

67. Delsignore and Wygant told Sherman that she needed to sign the discipline form, or she would be fired.

68. Sherman said she would sign the discipline form if she were allowed to write her version of events at the bottom of the document.

69. Delsignore and Wygant told Sherman that she had to sign the discipline form as it was, with no additions.

70. Sherman again refused to sign the discipline form.

71. Delsignore and Wygant told Sherman that she was fired.

72. At least two of Sherman's coworkers were nearby when Delsignore and Wygant fired Sherman.

73. Defendants fired Sherman on January 19, 2022.

9

### Sherman's whistleblower and safety and health complaints to OSHA

74. In late-January 2022, Sherman filed a complaint with OSHA under Section 11(c) of the OSH Act, 29 U.S.C. § 660(c). Sherman alleged that she had been fired because she complained to her employer that it was not adequately protecting her from COVID-19.

75. Sherman also alleged that her former employer (1) was permitting employees to work while symptomatic and infected with COVID-19, and (2) had required Sherman to conduct COVID-19 tests without providing her appropriate safety training or PPE. Based on Sherman's complaint, the OSHA Providence, Rhode Island Office opened a safety and health inspection of the Employer Corporations on January 27, 2022 (the "2022 Inspection").

76. The 2022 Inspection is ongoing.

### Defendants retaliated against and harassed Sherman after they fired her

77. In the time since she was fired, Sherman has received anonymous phone calls from individuals believed to be former coworkers harassing her about her termination and inspection activity at the medical offices.

78. Sherman sought public assistance after she was terminated.

79. After firing Sherman, Defendants did not respond timely to requests for proof that Sherman is no longer employed and thus qualifies for public assistance. Defendants' failure to respond to these requests has impeded Sherman from receiving the critical services that she and her family need.

### Sherman's damages

80. Sherman feels anguish about how Defendants treated her when they (1) forced her to choose between her health and her livelihood while she was employed, (2) fired her for raising safety concerns, (3) facilitated harassing phone to her, and (4) impeded her from securing

important public assistance for herself and her family.

81. Sherman is pregnant and supporting two young children. Sherman is not able to support herself and her family financially in the way that she could during her employment. She is worried about how she will provide for her family without her job at the Medical Offices.

82. After she was fired, Sherman was unable to make her car payments which resulted in her car being repossessed.

83. Defendants' failure to provide evidence of Sherman's termination has impeded her and her family from obtaining public benefits that she may be qualified to receive.

84. Sherman was recently told by her doctor that she needed to be on bed rest. Sherman has also had to take extra precautions and receive extra treatment during her pregnancy following Defendants' retaliation. Sherman feels that these health effects are the result of the distress and anguish caused by Defendants' retaliation.

85. Sherman's condition has also made it more difficult for her to work, which has further exacerbated the financial harm that she has suffered.

## Punitive Damages Are Necessary and Appropriate

86. Punitive damages are warranted because of Defendants' intentional or reckless disregard for the law, i.e., their unlawful termination retaliation against Sherman as detailed above, and callous indifference to employee's rights under the OSH Act.

## COUNT ONE
**(Violation of the Anti-Retaliation Provision of the OSH Act, 29 U.S.C. § 660(c)(1))**

87. The Secretary incorporates by reference and re-alleges all foregoing allegations in the Complaint.

88. Sherman engaged in protected activity on January 19, 2022, when she raised concerns with management that a coworker was potentially exposing Sherman and other

employees to COVID-19 in the workplace.

89. Sherman engaged in protected activity at other times from November or December 2021 to mid-January 2022. This includes, for example, when she complained to Dr. Farina that she had not received the training and PPE she needed to safely perform COVID-19 tests, and that coworkers were at work and not isolating after they tested positive for COVID-19 and/or while they were still symptomatic.

90. Defendants have violated Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1), by discharging Sherman because she raised good faith safety concerns to her employer, facilitating harassing phone calls made to Sherman, and failing to cooperate with Sherman and public assistance agencies to provide proof of Sherman's discharge.

91. As a result of Defendants' retaliatory actions, a reasonable employee may well be dissuaded from engaging in activities protected under the OSH Act, such as filing a complaint with OSHA or cooperating with OSHA's ongoing 2022 Inspection and/or the Secretary's pending OSHRC Action.

## **PRAYER FOR RELIEF**

WHEREFORE, cause having been shown, the Secretary respectfully prays that this Court enter judgment against Defendants and provide the following relief:

1. An Order permanently enjoining and restraining Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants, from violating the provisions of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1), including by terminating any employee, by threatening any employee, and by harassing or otherwise interfering with any employee's exercise of their rights under the OSH Act, including by impeding an employee from obtaining public benefits because that employee

asserted their rights under the OSH Act;

2. An order awarding lost wages, plus interest, to Victoria Sherman, resulting from Defendants' unlawful termination of Sherman in violation of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1);

3. An order requiring Defendants to pay to Sherman all other compensatory damages arising from Defendants' violations of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1), including damages for emotional distress resulting from Sherman's unlawful termination;

4. An order awarding punitive damages for Defendants' egregious retaliation against Victoria Sherman in violation of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1); and

5. Grant all appropriate relief, including, without limitation:

   i. Require Defendants to provide a complete good faith response within 5 days to any request by Sherman or any other person concerning public benefits or assistance that Sherman may be seeking, to include a neutral letter regarding Sherman's discharge;

   ii. Require Defendants to provide Sherman with a neutral letter of reference;

   iii. Require Defendants to expunge from their files any statement or information regarding adverse action taken against Sherman that relates to the allegations in this Complaint;

   iv. Require Defendants to post in a prominent location at each of the Medical Offices (i.e. North Providence Primary Care, North Providence Urgent Care, Coventry Primary Care, and Coventry Urgent Care), for no less than 120 consecutive days, a notice easily seen and readable by employees stating that Defendants are prohibited by court order and Section 11(c) of the Act, 29 U.S.C. § 660(c) from in any manner discriminating against employees because of such employees engaged in activities protected by the Act;

   v. Require Defendants to disseminate electronically to all current employees at the Medical Offices, and all employees hired to work at the Medical Offices within two years after the date of any final judgment in this matter, a notice of such employees' rights to not be discriminated against for engaging in whistleblowing activity under Section 11(c) of the Act, 29 U.S.C. § 660(c);

    vi.    Require Defendants to pay the costs of this action; and

    vii.    Grant such other relief as is just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Secretary requests a jury trial in this matter on all issues triable by jury.

Respectfully submitted,

Seema Nanda
Solicitor of Labor

Maia S. Fisher
Regional Solicitor

Kelly M. Lawson
Counsel for Civil Rights

/s/ Scott M. Miller
Senior Trial Attorney
miller.scott.m@dol.gov
MA BBO No. 666509

U.S. Department of Labor
Attorneys for Plaintiff

Post Office Address:
JFK Federal Building—Room E-375
Boston, Massachusetts 02203
TEL: (617) 565-2500
FAX: (617) 565-2142
Boston Regional Office

DATED: March 11, 2022